The next case for argument is Phommathep v. County of Tehama Good morning, Your Honors. May it please the Court. Harini Raghupathy on behalf of the In their operative complaints, the plaintiffs have pleaded enough facts to make their claims for a state-created danger under the Due Process Clause and discriminatory police services under the Equal Protection Clause plausible. So I'd like to begin with the state-created danger under the Due Process Clause. And here, if we take the allegations in the operative complaints as true, defendants affirmatively placed the plaintiffs at greater risk of Neal's dangerous and deadly gun violence. And to state a claim for a state-created danger, there's three elements that the plaintiffs plausibly have to plead. The first is that the defendants undertook affirmative actions that created or exposed the plaintiffs to an actual particularized danger. The second is that the danger was foreseeable. And the third is that the defendants were deliberately indifferent to that known or obvious risk. Counsel, you're working at a very, very high level of abstraction. This was an ongoing dispute between neighbors with a very, very unpleasant guy here, and you may have been able to anticipate that he was a dangerous guy. But saying that the danger is foreseeable, that he's going to go on a mass shooting spree, is very, very difficult to say that that was that that was foreseeable by anybody. And that they were deliberately indifferent to the danger of a mass shooting. Again, very, very difficult. That's a very, very high level of abstraction. We'll leave police liable to almost anything, almost any declination to take, haul somebody down the station on a DUI. If an officer in his judgment thought it wasn't a really bad DUI, and all of a sudden the drunk driver kills somebody else, even if it's the next day, you'd be right back in here at this level of abstraction. So, Your Honor, I have two responses to that. One is, I'll start with the facts, and then I'll turn to the law. So the facts in this case are, as Your Honor said, it's an ongoing incidence of violence. But I would point out that it's unfolded over the course of a year, and it was persistent, and it was escalating. And I think that escalating is an important factual distinction, because initially what defendants know is that Neal's reported to shoot on his property. Then he's reported to shoot hundreds of rounds at a time. Then he's reported to shoot towards his neighbor's homes. Then he begins shooting directly at his neighbors. And then he begins shooting at his neighbors, and he actually physically assaults them. There's stabbings. There's punching. So we have physical violence along with guns toward individuals. And so I think that pattern of persistent escalating violence here takes it away from that level of abstraction that you were talking about, Your Honor. And then I also want to point out that as a legal matter, this court has said that foreseeability is satisfied when the factual circumstances suggest that the person has a predilection for violence, and that they're capable of the attack that they in fact perpetrated on the plaintiffs. And here, I think given this persistent pattern of escalating violence involving guns, involving physically assaulting individuals, stabbing them with a knife, I don't think the gap is too far, particularly in terms of plausibility at the dismissal stage, to say that the danger here was foreseeable. How did he get out after stabbing and shooting someone? Was he released on bond? He was released on bond, Your Honor. That seems that well, anyway. I was surprised by that as well, but that's what happened. And then to address Judge Bybee, Your Honor's question about deliberate indifference. So here, I think in light of that pattern of persistent escalating violence, what we have that's alleged in the complaint is that defendants were subject to the repeated reports from residents in Rancho Tehama. So when individuals would call to report Neal's violence, the defendants would dismiss the complaints as not credible, as civil disputes. They would even sometimes threaten the individual callers with penalties for reporting Neal. And there's an allegation that in one particular instance, they told a caller to mind her own damn business. And so I think given that non-responsiveness and that level of contempt for the individuals who were reporting Neal's violence, that that, I think, suggests here that the risk was not only known or obvious, but that defendants actually knew about the risk and they decided to ignore it. But knew what? Knew what kind of risk do they need to know about? That the guy's explosive, that he's a loose cannon, that he might pop off and do something. How would they possibly know that he would start shooting people he didn't know? Your Honor, I think the reason they know that is because there's two, at least two, prior instances where he shot individuals. So in November 2016, he shot at a neighbor and he, I believe he shot at her and her companion and he punched that neighbor in the face. So that was November 2016. We're talking about a year before the actual shooting. And then in January of 2017, this is the offense for which he was arrested and then charged, he again, he shot at a neighbor several times and then he stabbed her companion with a knife. And so he was arrested for that offense. He was charged with assault with a deadly weapon. And then he was also charged with grossly misusing a firearm. And those were the offenses for which he then became subject to criminal and civil red flag laws that prevented him from, the orders that prevented him from being able to use or possess guns. So I think that the, the orders, the protective orders in this case, both the civil and the criminal also go far away in establishing foreseeability and the dangerousness of this particular individual. He's been determined by both the civil court and a criminal court to constitute a danger, particularly in relation to firearm use. And I think that is, again, goes to show here that the danger was not some, you know, speculative danger, but it was actually foreseeable in this case. You know, what is concerning is that all of this leads up to, it could be, I won't say garden variety because there are no garden variety domestic abuse cases, but there are multiple domestic abuse cases that have similar characteristics like this, where there's an escalation, there's a protective order, a restraining order. Officers are called back, things, you know, they make a judgment, they don't do anything. And then sadly, the victim is killed. So what is the controlling principle so that not every one of those turns into a state created danger situation? Certainly, Your Honor, I think the principle here is huge. It's tied to the elements of the test that this court has set forth. And I think the key question, I think, in this case is whether defendants undertook affirmative acts that emboldened Neal. And the Martinez case, which this court decided in 2019, actually involved a domestic violence incident. And in that case, the court found that the police made two comments to the assailant in that case. First, they told the assailant, you know, kind of in a derogatory way, when the police arrived at the scene responding to a crisis, they told the assailant, you know, sort of suggesting that they had derision for her and contempt for her and that they were on the side of the assailant. Right. See, that's my problem. That's a lot more affirmative acts by the police there. They're targeting that woman for violence by saying, what are you doing with her? She's not your level here. I don't think there's anything that's akin to that. Well, I think, Your Honor, I would respectfully disagree. I think the allegations are in the complaint that in November 2016, one of the neighborhood members called the police to report an incident of shooting. The police responded to the scene. And then first they told Neal, your neighbors are complaining about you constantly. And then the second thing they told him is that you would face, they expressly told him, you can keep doing what you're doing. You're not going to face any repercussions. And those are the allegations in the complaint. And that is. Well, I think, well, technically, as I see it, it was you could continue to own and discharge firearms in the community. Is that is that the allegation you're talking about? Yes. It's it's it's throughout the operative complaints that I think about six or seven different times. The quote that I'm looking at comes from, I believe, 360 page 360. He faced no repercussions for continuing to misuse firearms after that time. Can I can I can I ask a question about that allegation that you could continue to own and discharge firearms in the county and the community? That seems implausible that the police would say he could discharge firearms in the community. Sorry, go ahead. So so I think, well, I have I mean, I do think that that is, you know, at this point, we have to take the allegations in the complaint as as true if it's possible. But I just can't imagine police saying, go ahead and you keep on firing this throughout the community. Right. And I think we have to step back at this point and look at the broader context. And this kind of ties to the second claim related to equal protection. But the allegations are that this was the defendant's sheriff's office in particular was very gun friendly and that they didn't want to enforce gun laws. And they had a particular hostility toward any kind of firearms restrictions. So I think that allegation sort of renders the statement that they made more plausible. I think it provides context for why they would want to make that. It seems like it's possible that he could he would say something like you can own and discharge firearms in your house, which is true. Right. Is legally true at that point. I believe so. But I think here the out the reports were that he wasn't he was firing them out on his property and he was shooting. He was arcing them. And then he's going to get right. And the defendants came out to his house and they saw shell casings that were scattering his property. They saw bullet holes in the fences, you know, going through his neighbors. And again, the reports were that he was directly shooting at his neighbor's homes and then later toward the neighbors themselves. And then to circle back, Judge McEwen took kind of the principle here. I think the other affirmative act we have is after Neil was released from custody on bond and he was subject to these civil and criminal restraining orders. He, in fact, called defendants over on three different occasions. It was July, August and October of 2017. So he called the defendants to report restraining order violations by other individuals in the community. And on each of those three occasions, defendants brushed off his complaints and said, look, there's nothing we can do about civil restraining order or criminal restraining order violations. That's a civil dispute. It's outside of our, you know, our jurisdiction of authority. We're not going to do anything. And so again, isn't that just inaction? I don't think it's inaction, Your Honor, because there's an affirmative communication. So I think it makes it akin to Martinez, where they tell the police officer, we're going to give you, through implication, they tell him, we're going to give you a pass. We're not going to arrest you because we think you come from a family of good people. But how do you get from a pass to it's OK to shoot, to conduct a mass shooting in your community, shoot up the neighbors and then shoot people you don't know? Because, Your Honor, at that point, any kind of gun ownership by Neil, he was subject to these restraining orders. So he wasn't allowed to own guns, let alone discharge guns. And so if they're telling him we're not going to enforce those violations, I don't think it's such a speculative or far leap to then for him to conclude when he already has this proclivity for violence to say, OK, well, what else? You know, I can then shoot at multiple people and there's not going to be any repercussions. And, you know, I think, Your Honor, skepticism may be well founded, you know, later on, you know, if we're unable to adduce evidence in support of this at the summary judgment stage or at trial. But I think for purposes of the motion to dismiss, we certainly clear the plausibility hurdle. You know, we have the Martinez was kind of a split decision. Some of the officers, of course, determined not to have immunity, but then in the other one where they didn't take any action said, well, that was basically not taking action was basically leaving the victim in the same position that she would have been in. And so that wasn't an affirmative act. Much of what happened here was failure to act. And so do we what do you think is the closest case that brings failure to act into the danger creation exception? Well, I don't think I think that unfortunately, I think the court's case law is clear that failure to act. This comes from DeShaney that the Supreme Court's case that failure to act doesn't give rise to a substantive due process violation. But I do think here I agree that a lot of the allegations concern inactivity. But I do think that there are these two critical allegations of affirmative conduct, which I had previously talked about the coming to his house in November 2016 and then the following year, repeatedly telling him they weren't going to enforce these restraining orders. I do think it takes it outside the failure to act bucket and puts it into the affirmative act bucket. I'd like to reserve the remainder of my time, if I may, unless the court has any further. I do want to pressure on the protection question. I didn't see any comparator in your in your complaint. I saw a general allegation that that the police didn't like this particular community, but I haven't seen anything that says that suggested that they enforced a lot differently in a city 10 miles up the road. There are no allegations of that in the complaint. Your Honor, there is an allegation of differential treatment compared to other cities or jurisdictions that are within to him a county. But there is no comparator case and we haven't alleged that this is on the basis of race or religion or ethnicity, nationality. No, we concede, Your Honor, that the allegations here are based on the geography that this particular enclave, that there was a bias toward that enclave as backwards, as sort of a hotbed for the sort of criminal activity. And that also there was a bias in favor of sort of very strong gun rights. And we we've as we've briefed in the posture that we've taken. But did you allege that they didn't have the same attitude towards gun rights in other communities? No, Your Honor, I think the sort of the two the two there are two sort of grounds for discriminatory policy here, and they're separate. So the first is that as concerns Rancho Tehama in general, that defendants harbored a bias toward them and underserved that community in providing police services. So that's one sort of category of discriminatory police services. And then the second separate category is that when it came to gun crimes anywhere or gun allegations anywhere within the jurisdiction of the defendants, that they selectively under enforce those crimes. That's not an equal protection claim. That's that there's there's no if you have no comparator, if they if they're under enforcing the crimes, generally, that's just that's just a problem with under enforcement. No, I apologize, Your Honor. When I meant under enforcement, I was omitting the sort of follow up, which is that they under and they selectively under enforce those crimes compared to other types of crimes. So there. Yeah, but that's just a distinguishing between crimes, not distinguishing between two classes of people. I think this is we've got we have we have questions across all kinds of communities in the United States as to what things are under enforced. You had allegations here in San Francisco. The D.A. was under enforcing certain kinds of lesser crimes such as shoplifting. That that doesn't that doesn't necessarily create an equal protection problem if they're being under enforced systematically. Well, Your Honor, it's only it's only if we can say that we're only enforcing we're only enforcing shoplifting crimes against African-Americans and not against white Americans. I don't believe I would disagree with your honor. And the reason I would say that is because we do have a case. It was Navarro versus block that we cited in the briefs. And that is a case where the. Plaintiffs made a claim that there was selectively sort of not not taking seriously crimes of domestic violence by women because they were women. And this court said, no, there's not enough to sustain this gender based discrimination. But we will say that there is we will let you proceed with a claim, an equal protection claim that you're treating domestic violence cases independent of the fact that they tend to predominantly affect women. We're going to we're going to. That's a that's an easy jump, counsel, from from domestic violence to violence against women. And that's that's a that's a very, very short step. But you've you've said you've just said that they're under enforcing gun guns in the in the community. And the question is, and what if your clients have been had been hit by a by a driver who was speeding and they were under enforcing, you know, the speeding laws, you'd be here on the same kind of thing. And I just don't see the equal protection allegations in that in that kind of a complaint. I understand your honor. I think I would again, I don't think it's such a far I would point the court to Navarro, but I understand your honor's differential reading of it. I don't have anything further to say on that unless you have further questions. Thank you. Thank you. Good morning, your honor. My name is John Snurin, and I represent the county of Tehama, the Tehama County Sheriff's Office, as well as Sheriff Dave Hencraft and Assistant Sheriff Phil Johnston. They have been personally brought into this lawsuit. The first thing is, I'm sorry that we have to be here and talk about this at all. This was a tragedy that happened in 2017. And you saw in my brief that I won't even name the mass murderer, and I intend to stick to that in my comments for you today. I've also done my research, and I know that the three of you have all been involved in these kinds of due process cases and have looked at some of the cases which outline the contours of the state created doctrine, which is essentially what we're here for today. It starts with, of course, Deshaney, where we would stand for the general proposition that the government does not have to protect individuals from criminals and madmen. And apparently that's what we have here. But then, as the dissent noted in one of the cases, Kennedy, that it was four months later that this state created what came to be known and is now known widely as the state created exception or state created danger doctrine. And that has not been adopted by the U.S. Supreme Court yet. So we are still outlining the contours of that state created danger doctrine. This particular case, if we've been determining the contours here, in my view, is way out here. It is not even close to a state created doctrine type case. Because what we are, what the plaintiffs are trying to do is they are trying to inject their view of what other people thought and then the inactions that those people made, inactions, to then have an effect on what another person, a mass murderer, might later have thought. And it's speculation upon conjecture upon speculation. And that's the ultimate problem that we have with this case. In all of the other cases that we have state created danger doctrine, there's usually a named officer, police officer. Let's use the Jameson versus Storm case that maybe you're familiar with. I can go over the details of that. That's where a young man and a couple of friends pull up in a pickup truck in a Chevron gas station up in Washington. Stop me if you know the facts of this case. And the driver has, he later admits that he had been drinking earlier in the day. And he sees an officer, Officer England, standing up near the front door. And he goes and bums a cigarette off of Officer England. They'd known each other. The young man had hunted on Officer England's property before. And so they talk for a while. Officer England gives him a cigarette. And the man goes on his way. Sometime later, he rolls the car over and kills one or more of his friends, DUI. The allegation is the state created that danger because Officer England didn't note that that young man should have been arrested for intoxication. He was underage. He had two women, I guess, in the back of the pickup truck. And I couldn't tell from the case whether or not they were being driven around in the back of a pickup truck like we used to do in the 70s, which you can no longer do, that sort of thing. But there were red flags alleged that this officer should have known that he should have taken this young man under arrest so that he couldn't have driven and so that he couldn't have gotten in that accident so that these people couldn't have died. It's speculation upon conjecture upon speculation. And in that case, in Jamison v. Storm, the state created danger doctrine did not apply. And the dismissal was affirmed. Even though Officer England talked to that person, and even though Officer England might have done something, Officer England's inaction did not create liability for the state. We have something very similar here. And when Judge McCown asked, what case do you have that's most similar? I think that maybe that Jamison v. Storm case is quite similar. But here's something that's very dissimilar. In all of those other cases where we talk about state-created danger, the time frame is very short. It's, I went and talked, or Officer talked to so-and-so, within minutes, hours, maybe a day, some bad thing happens that is foreseeable. And Justice Bybee, you bring up the same case. How could this possibly foreseeable? We have to look at the timeline in this case that is alleged. And one of the problems that we have as the appellees in this case is our hand is sort of tied, one behind our back, because we're dealing with the operative facts of the complaint. And I complained loudly in my brief that these are half-truths, they're not exactly what happened, and the timeline's all messed up. But let's take parts of the complaint that I can talk about that is accurate. In November of 2017, there's an incident, and it is alleged, because we haven't gotten that far, it's alleged that there's some interaction when two people are near the madman's property. And allegedly, he takes a shot at somebody. This is 2016. 2016, yes. November, did I say 17? You did. Sorry. Thank you for correcting me. It's a year in advance. This is the first time that we have any record of any law enforcement involvement with this man. Now, the plaintiffs have all of the records. They could adequately allege what actually happened. Because prior to filing the case, they did public records requests, and they got everything from us. So they know exactly what happened, why it happened, how it happened, what happened when the police officer showed up to investigate it, and why no arrests were made. None of that shows up in the complaint, because it doesn't add to their narrative. But it happened. There is an event. There was an allegation of a gunshot. There's an allegation of an assault. But no arrests. Okay. We'll set that aside. Next thing that they allege is in January of 2017. So this is 10 months before the terrible day. And what is alleged is that Diana Steele, a neighbor, and Haley Poland, the girlfriend of the neighbor's, Diana Steele's, son, were out gathering firewood near the madman's property. Okay. The allegations are that he fired a shot at one and stabbed the other. True. Okay. And that he was then arrested for that. Okay. What we don't get to talk about yet, and we may, and I'm only saying this because the timeline is jacked, and I don't want to stray too far, is the madman made the call to police. Why would he do that? We'll find out if this case ever survives, but why would he call the police and then himself get arrested? You don't know that in the operative complaint. They know that, but they're not citing it. I would want you to stick to the allegations in the complaint. I will. Because that's what we're evaluating. But let's take the operative. My question is that you have said, look, the foreseeability, these are not imminent. It's not like the police came one day, didn't do anything, and the following day, that would be Kennedy. And that's the point of my argument. I'll get to that. So how do we judge that on a motion to dismiss? How do we judge the question of imminence? And how do we draw those lines on a motion to dismiss? Well, I don't think we have to reach that question because we have the test that we have in, I don't know, Jamison v. Storm, and DeShaney, and Wills, and Pleasant, and let's see. Essentially, all we really have to do is determine whether or not there was action at all taken by the officers. I'm only bringing up the timeline because I'm differentiating all those other cases and then showing not only do we have a timeline problem, we don't have a situation where any of the officers actually took any action that placed any of these plaintiffs in any more harmful situation than they found themselves, because they lived in this community. I'm sorry. Yeah, what's your response to the allegation that officers told him that he could own and discharge firearms in the community? Well, again, that doesn't sound plausible, and they have the record to know exactly what was said, and I will represent it wasn't that. Do you know what the allegation was based on? Was it recorded in some way? Yes. All of these are recorded 911 calls, so we can find out exactly who called, what they said, and they have them. But I would have to admit that at that first episode in November of 2016, certainly no guns were taken away from him, and he wasn't arrested. I don't know what was said to him. Haley Poland is not a party. I might be confusing myself as to who was party to the 2016 incident. I'll leave it. You know, it seems to me the more significant incident is he does get arrested in 2017. Correct. And then they have these court orders. Yep. And it seemed to me their case rested primarily on everything that happened after that. Sure. Which was not doing anything about the continued report that he was violating these restraining orders. The operative complaint says that he was discharging guns on a nearly daily basis. That sounds implausible. Moreover, they have the 911 calls to know that that's not true. What we can establish in the actual timeline is, so he was arrested in 2017. The rifle that was used in that incident was taken from him. He then turned in a handgun later. And then there was a call from his wife, Barbara Gleason, who I want to take a moment to mention because no one mentions her for a second. But she calls after he gets the restraining order and says he needs to turn in his gun. And she says, I had a gun. Madman was told to turn in all guns. And I can't find it. I'm just letting you know. They have that recording. But they have spun it to somehow say that somehow she was in danger and she was afraid of her own husband. There is no evidence of that at all. But while we're talking about Barbara Gleason, she was the first victim of this guy's terror. And no one has mentioned that. He killed her perhaps the night before he goes on this spree. No one's speculating as to what that's all about or why that happened. Who is she? Who is Barbara Gleason? His wife. His wife. And so what the plaintiffs are trying to say is the state created this danger because they didn't arrest him. And they didn't take away his guns. And we were supposed to be the ones who were protected from him. Barbara Gleason presumably loved this man and stayed with him. I wouldn't make that argument if I were you. We don't know this. We don't know this. But she was the first victim of all of this. And no one talks about her. And she can't sue because she's dead, right? I don't know if she has an estate or people who may sue. Because these plaintiffs, they represent the estates of people who have passed away. All I am saying is Barbara Gleason bears some mention because of this man's bad acts. Maybe I'm missing something here. So he not only killed his wife, but then he goes on a spree. The reason why I bring it up is it's purely speculative as to why he did any of this. We don't know why he killed Barbara. We don't know why he killed the next door neighbor McHugh. We don't know why he took shots at the Fomatheps as he went off to Rancho Tehama School. We don't know why he shot up the school. We don't know why on the way back he ran into the McFadden's and killed them. We don't know why he stole Mr. Bonsego's vehicle. I don't think their premise matters as to why so much as they're sort of arguing a but for. But if they had enforced the laws and gone after him, then he wouldn't have been in a position to do all of this. So I'm not sure it matters why he shot people. What would be the legal... Exactly. Their first amendment complaint or second amendment complaint, because they're all slightly differently titled, at paragraph 26, but for the misconduct of the TCSO in actively sanctioning his misconduct. Actively sanctioning his misconduct is what they allege. Neil would not have had firearms on November 14, 2017, would have been deterred from recklessly using and or illegally possessing firearms, and or would have been in custody. So they're making direct connections that whatever inaction we're accused of, that's the reason why he did this. And that's implausible. It's implausible that they know that's why. It's just as implausible that they know that's why as they say that Sheriff, Assistant Sheriff Phil Johnston, has such a dim view of the people and that he didn't, there's nothing that he wanted more, sorry, that he hated more than enforcing second amendment. So can I ask what your position is, is that any officer inaction cannot be, say, created danger? Is that generally your position? No. I think the distinction and the contours, I think that's the great way of saying this, the contours of the state-created doctrine are if an officer has taken an affirmative step to create a situation or place a person into a situation where they might then experience further danger. Would v. Ostrander is a good case. That's the one where the officer led a woman out in the middle of a high crime neighborhood at 2.30 at night. Ostensibly, he didn't have to do that. That seemed like a pretty bad idea. And it increased the danger to her. But there was an action taken. Similarly, which one is it? It's the one where the officers kicked the guy out of a bar. It was 11 degrees out at night. All he had was jeans and a t-shirt on. The Munger case. Thank you. They start to run again. You are doing something that places the person in danger. What's the other one? I think the closest one is Martinez. Is that with the girlfriend? Is this the new one? I'm not sure. But where the officer is telling him, what are you doing with that girl? That is Martinez. Martinez v. City of Clovis. That seems closest to this case. Where they say to him, we can't do anything about violating the, is it a red flag law? When he calls in about the neighbor's son. Yes. I think the Martinez case was really more of, what are you doing with that woman? Or she's not your type. That sort of thing. But there was affirmative, there was some sort of camaraderie expressed with the perpetrator. Right. Which causes the link, which makes the perpetrator potentially emboldened. Interestingly, I mean, I think that's essentially what that case stands for. But see, it's not just inaction. And it's not just talk. I mean, for example, when you were questioning opposing counsel, it's like, that seems implausible that you would call and report something to 911 or the emergency services. And they would say, oh, it's okay that he can continue to shoot in the community. If we had a rule that everything that a police officer or law enforcement says, then can create liability because of whatever effect it has on the hearer, then there are no more contours to say create a danger doctrine at all. There must be some action, like bringing somebody out and putting them in 11 degree cold. Or dropping them off in the middle of the night. Or, let's see, what's the other one? In Hernandez, directing Trump rally people, attendees to go towards a violent mob. Or in Pensilla, where they canceled a paramedic's request, then they broke down the man's door, stuck him inside and locked the door behind him, and then he later died. There has to be something that happens. In this case, there are no allegations that anything happened, except for the fact that there was inaction. And especially getting back to our timeline. But, you know, there are some allegations of talking to him, communications to him. Sure. But maybe you would argue that it requires a reasonable response to those statements. Or something like that. Something that would indicate to him that as a result of that talk, that they somehow condone what he's about ready to go do. Which in this case is mass murder. There is a complete break in that connection here. Between anything that the officers are alleged to have said to him, and again, these are unnamed officers, we don't know who talked to him and what they did. It certainly wasn't Dave Hencrat, Sheriff Hencrat, and it wasn't Assistant Sheriff Phil Johnston. None of those people have any liability for this. In opposition to that, let's look at Jameson v. Storm. Officer Englund was in fact named, because that's the person who allegedly said the thing and then did allegedly, may have done the thing, that then led to these people's damages. We don't have that here. So going back to the timeline, if you have any more questions, I'm happy to be your punching bag. But going back to the timeline. I hope it's a little more pleasant than that. It's okay. I know that you folks know these cases better than I do. And so I want to make sure that I'm representing what you already know in a fair light. Anyway, he's arrested in January 2017. He is bailed out. And there are other interactions. The complaint talks about the fact that there's an ongoing feud between these two neighbors. And they call the cops on him. He calls the cops on them. Ultimately, the cops, either they come by and see that nothing's happened and drive away, or they don't come at all. That is inaction. They say that mass murder must have known and been emboldened by the fact that the cops come by and don't do anything. But then they allege he was hiding in his house. And I make the point in my appellate brief, how is somebody who is emboldened by these things hiding? That's not somebody who's emboldened. That's somebody who's scared. And this is a person who has already had several instances with the police. One where he was called on because he was apparently stabbing and shooting over somebody. And one where he was actually arrested. And he was about ready to stand trial and was going to stand trial for that in 2018 before he had whatever happened on November 14th, which was a tragedy. And I think my time's up. Unless you have any other questions, I'd be happy to answer them. Thank you, Counsel. Thank you. So there's been a lot of discussion just now about things that I don't think are necessarily relevant to the question before this court, which is whether the legal sufficiency of the allegations. And I understand my colleague has different views on the truthfulness of those allegations. But of course, that's irrelevant at this stage of the pleading. So I'm going to set that aside. I just want to point out, though, that the question about the 911 calls, the complaint alleges that some calls were in fact deliberately not logged. And so even though plaintiffs did get access to some of the 911 calls, the allegations are that there are omissions and gaps in those calls. And so I think that goes a far way to explaining that sort of piece of it. But getting back to the legal sufficiency, I do think, Judge Bumate, that I would agree with you that Martinez is the closest case. And I understand there's some factual differences in the domestic violence context as opposed to here, this is neighbor-on-neighbor violence. But I think Martinez is important for two or three reasons. First, it establishes this idea of emboldenment. And I think here the allegations are that these two affirmative communications that defendants had with Neal in November of 2016 and then three occasions in 2017 emboldened him to believe he could either shoot his guns or violate his restraining orders with impunity. I guess I would... And your opposing counsel challenges that. It's not emboldening it. It's more about condoning it. And Martinez could be taken for proposition that you can't condone the violence. And so that's a little different than emboldening. And what's wrong with that as the framework that we adopt? Well, I think that... I believe Martinez uses the word emboldened two or three times in the opinion. So I think that would be contrary to the actual language in Martinez. And I think Martinez is also important because it is a case that involves a little bit more of an extended timeline. And so the police come out to Pennington's house, I believe on two occasions and then there's subsequent violence. So it's not like the police come out they do something and then this terrible incident happens the next day. It occurs at least over the course of I believe two or three months. So I think it's important for that. And then in this case too, Judge Bybee asked about the timeline and the allegations in the complaint are that shortly before the mass murder that Neal's family in fact called defendants and they reported that he was mentally unstable, he was deteriorating and that he was in possession of several guns. And so I think that to the extent timeline matters I think that call shortly before the mass murder suggested that any kind of danger here was imminent. And also actually that's it. Unless the court has any further questions. Thank you very much counsel. This case is submitted and we are adjourned for the week. All rise.
judges: McKEOWN, BYBEE, BUMATAY